UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ALLENMORE MEDICAL INVESTORS, LLC, a Washington limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF TACOMA, WASHINGTON, a municipal corporation; MARILYN STRICKLAND, an individual; LAUREN WALKER, an individual; RYAN MELLO, an individual; JAKE FEY, an individual; VICTORIA WOODARDS, an individual; MARTY CAMPBELL, an individual; DAVID BOE, an individual; and JOHN DOE 1-20,<br><br>Defendants. | No. 3:14-cv-05717-RBL<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

This cause came on for a non-jury trial on March 6, 2017, the Honorable Ronald B. Leighton presiding. The Court has considered all trial testimony and exhibits. The Court has further considered the Pre-Trial Order, together with all relevant attachments, all pleadings and discovery on file, all post-trial submissions, the parties' proposed findings of facts and conclusions of law, and trial briefs. The Court has also considered applicable statutory and case law. On the basis of its own careful observations during trial, its credibility assessments of all

witnesses appearing live at trial, or by depositions, and the detailed consideration of all of the above materials, the Court now enters the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

1. Plaintiff Allenmore Medical Investors, LLC (AMI) is a limited liability company formed under the laws of the State of Washington. AMI is, and has been, managed by Jeffrey L. Oliphant. AMI was at all relevant times the developer of the commercial project located at 1965 South Union Avenue, Tacoma, Washington, now known as Allenmore Marketplace.

2. Defendant City of Tacoma, Washington is a municipal corporation. It has authority and responsibility for issuance of building permits, land use approvals, parcel configuration approvals, including boundary line adjustments, and other approvals for real property developments within the City.

3. In 2011 and 2012, Defendants Marilyn Strickland, Lauren Walker, Ryan Mello, Jake Fey, Victoria Woodards, Marty Campbell, and David Boe were members of the Tacoma City Council. Marilyn Strickland was the Mayor, and Lauren Walker was the Deputy Mayor (Individual Defendants).

4. In February 2010, JLO Washington Enterprises, Inc. (JLO) contracted to purchase real property located in Tacoma, Washington, then owned by the Tacoma Lodge No. 174 of the Benevolent & Protective Order of Elks. The Elks Property consisted of 17.7 acres of real property located between Union and Cedar Avenues, north of South 23rd Street, in Tacoma.

5. JLO is a Washington corporation and an affiliate of AMI. In May 2011, JLO assigned to AMI all of JLO's right, title, powers, and interest in the purchase and sale

agreement with the Elks and the Elks Property, and AMI accepted the assignment. An "Assignment of Buyer's Interest in Purchase and Sale Agreement" was recorded on June 14, 2011 in the real property records of Pierce County, Washington under Recording Number 201106140566.

6. In December 2010, JLO filed a State Environmental Protection Act ("SEPA") application, together with a grade and fill permit application, with the City of Tacoma, including all required studies and backup to support the applications. The primary development project described in the SEPA application consisted of a medical and related professional office campus, including up to 760,000 square feet of medical and professional office space, a hospital, and retail space. The SEPA application also included an alternate project consisting of 155,000 square feet of retail space and 200,000 square feet of medical and professional office space. On or about March 23, 2011, the City of Tacoma issued a Mitigated Determination of Non-Significance (MDNS). On or about July 27, 2011, the City of Tacoma issued a Final Mitigated Determination of Non-Significance (SEP2010-40000156354) and Building Permit (grade and fill permit) (BLD2010-40000156353).

7. Beginning in early 2010, JLO began working with a large medical services provider, MultiCare, to be the primary occupant of the commercial project on the Elks Property. MultiCare became indecisive regarding its needs in the spring of 2011, and communicated to JLO its final decision not to proceed with the project in July 2011.

8. Given MultiCare's indecisiveness and subsequent decision not to participate in the project, JLO reviewed alternative uses and occupants for the Elks Property, and the entitlements and other approvals needed to proceed with an alternative development.

9. In May 2011, Kevin Sweet, Walmart's Real Estate Senior Director, and Jeffrey Oliphant reached a handshake agreement to acquire the "Elks Lodge" property for $19.00 per square foot, or just under $11.9 million. Mr. Sweet obtained approval from Walmart's Real Estate Committee on August 15, 2011 at the agreed price, with a closing date of November 1, 2011, and without further entitlements beyond those AMI held at that time: a Final Modified MDNS and the associated grade and fill permit.

10. In August 2011, AMI proposed a U-Turn for southbound Union Avenue to access the proposed development. The U-Turn was placed on the agenda for the August 24, 2011 meeting of the City's Environmental and Public Works Committee (EPW Committee). Kurtis Kingsolver, the Tacoma City Engineer and City Traffic Engineer, requested that the EPW Committee give the U-Turn a "Do Pass" recommendation.

11. At the August 24, 2011 meeting, EPW Committee members asked whether the proposed development of the Elks Property included a "big box" retailer. The EPW Committee rejected the U-Turn recommendation and did not make a "Do Pass" recommendation to the City Council. A decision on the U-Turn proposal was scheduled for the next City Council meeting, to be held on August 30, 2011.

12. While the EPW Committee meeting was still in session, Defendant Mello emailed City Attorney Elizabeth Pauli "RE: Walmarts." Following the EPW Committee meeting on August 24, 2011, Jeffrey Oliphant informed several Councilmembers the Project would include a Walmart store.

13. During or shortly after the Committee meeting, Councilmember Mello requested the City Attorney draft a Moratorium to halt development of big-box retail stores.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
(Cause No. 3:14-cv-05717) – Page 4

14. At the regularly scheduled Tacoma City Council meeting held on August 30, 2011, Defendants Mello, Fey, Campbell, and Walker introduced a proposed ordinance not included on the published Agenda for the meeting: to adopt a city ordinance imposing a six-month Moratorium, due to "public emergency," on the filing, acceptance, and processing of applications for land use, building permits, or other development permits associated with the establishment, location, or permitting of retail sales establishments with a floor area greater than 65,000 square feet in size, unless complete applications were filed with the City prior to the effective date.

15. The Moratorium was denominated as City of Tacoma Ordinance No. 28014. Defendant City Councilmembers Strickland, Walker, Mello, Fey, Woodards, Campbell, and Boe voted in favor of Ordinance No. 28014. The U-Turn proposal was removed from the agenda of the August 30, 2011 City Council Meeting.

16. No notice was given to AMI or to the public prior to August 30, 2011, that the U-Turn proposal would be taken off the agenda of that day's City Council Meeting or that the Moratorium would be proposed or adopted.

17. The Moratorium was proposed and adopted in direct response to the disclosure that Walmart was the intended anchor tenant for the shopping center AMI was developing at the Elks Property.

18. At the time the Moratorium was enacted, the Tacoma Central Neighborhood Council (CNC) and other constituents had expressed opposition to a Walmart store entering the community.

19. Pursuant to applicable law, Ordinance No. 28014 could not take effect until publication in the Tacoma Daily Index, the City's designated legal publication. Ordinance No.

28014 was published in the Tacoma Daily Index on September 1, 2011, and took effect upon such publication.

20. Meanwhile, on August 31, 20111—prior to the effective date of the Moratorium—the developer filed an application for a building permit (No. 40000168923), together with related applications and approvals to construct a new retail store of approximately 155,000 square feet on the Property (the Building Permit Application), with the City of Tacoma.

21. The Building Permit Application covered the entire Property, including not only the portion on which the Walmart store was to be constructed, but also portions that AMI intended to retain and upon which AMI would be constructing improvements. It included onsite and offsite improvements for roads, utilities, traffic signals, and access drives. The Walmart parcel is landlocked, with no frontage or access on any public street. Pedestrian and vehicular access was only through the property being retained by AMI. It would not be possible, physically or legally, to build the Walmart building without access through the AMI property.

22. Jeffrey Oliphant was the developer of the Project and led the team that filed the Building Permit Application. Oliphant wrote and submitted to the City an AMI check for the Building Permit Application's fee of $44,183.67. The City issued a receipt for the Building Permit Application fee to AMI and entered the application into the City's permit database with AMI listed as the applicant.

23. At the time they filed the building permit application, the developer delivered a SEPA Addendum Application. The City took the SEPA Addendum Application, but they

would not accept the fee, due to confusion caused by the Moratorium. The City would not process the SEPA Addendum because the fee was not paid.

24. At the time the Building Permit Application was filed, AMI held rights to purchase the subject Property pursuant to an option contract with the Elks, and had spent approximately $900,000 in fees and expenses paid to third parties in connection with the Project. As of August 31, 2011, AMI and JLO had worked on the Project for more than one and one half years.

25. The Building Permit Application was "complete" for purposes of RCW 19.27.095 and Tacoma Municipal Code (TMC) 13.05.010 when filed on August 31, 2011.

26. Sweet explained that when the building permit was submitted and accepted on August 31, Walmart "wasn't expecting" the building permit to be issued by November 1, because they had anticipated "at least one or two rounds of comments" from the City. "[I]t didn't really matter if at that point" whether comments were received by November 1 because "at that point we were vested, and typically in situations like this, comments from the City on a building permit application is really just technical in nature." (3/27 Tr. at 13:15–14:7).

27. Andy Epstein of BCRA called the City on September 7 and advised that Walmart was expected to purchase the property *before* the permit was issued. Patti Costa's September 8 email to David Johnson stated:

> Andy Epstein called. The application is correct and the permit should be changed to be in Wal-Mart and not Allenmore Investors. *He indicated the sale will take place **before** permit issuance.*

Ex. 43 (emphasis added).

28. David Johnson forwarded this information to Charlie Solverson by email on September 9, 2007, stating:

> A clarification was requested from the applicant on 9/7/2011 and a response was received on 9/82011 indicating that *the change in ownership as noted is planned to be in effect **before** permits would likely be issued*.

Ex. 116 (emphasis added).

29. Everything changed when the City applied the Moratorium to the vested project. Once that happened, Walmart perceived that the projected had become much more risky and was no longer willing to close without additional entitlements.

30. Sweet explained the City's refusal to accept a BLA due to the Moratorium "changed the risk equation" because "[i]t didn't feel like we were being treated fairly by the City." (3/27 Tr. at 15:14–24). In Sweet's words, "if the City was going to deem our application vested but yet refuse to process the permit, . . . who knows what the City was willing to try to do to prevent us . . . ." (3/27 Tr. at 16:11–23).

31. On September 16, 2011, City Councilmembers were advised in writing that BCRA and Walmart would be receiving a notification that the Building Permit Application was complete and vested prior to the effective date of the Moratorium. They were also advised that a boundary line adjustment application would be required for the City to continue its review of the building permit application, and that the City would not accept the boundary line adjustment application based on the Moratorium.

32. The environmental, traffic, and other impacts measured by the permitting process were appreciably less in the case of the Walmart plan versus the medical complex first envisioned in the SEPA application, and the grade and fill permit that received a Final MDNS on July 27, 2011.

33. On September 16, 2011, the City formally advised the Project architect the Building Permit Application was complete and vested to the codes in effect as of August 31, 2011. The September 16, 2011 letter and attached Status Report also advised the application was being placed "on hold," stating:

> During preliminary review it was noted that the plat configuration … does not accurately reflect the existing parcel configuration. Further, due to the City's adoption of [the Moratorium], the City cannot accept any application for a boundary line adjustment or other plat-related submittal to change the lot configuration at this time. Therefore, the City's review of the submittal is on hold. From the City's perspective, there are two options for how to proceed:
>
> 1. You can submit a revised application that accurately reflects the existing parcel configuration and demonstrates how your proposed development meets code requirements for that existing parcel configuration; or
>
> 2. You can agree to leave the City's review of your application in its current status until the Moratorium either expires or is terminated or modified so as to permit acceptance and processing of a boundary line adjustment consistent with the proposed configuration shown on your existing submittal.

34. The City's decision to place the Building Permit Application on hold and to refuse to accept and process a necessary boundary line adjustment (BLA) had been discussed during Executive Sessions of the Council. The purpose of the decision to place the Building Permit Application on hold and to refuse to accept and process the BLA was to stop the Walmart project. As the Court already determined on partial summary judgment [Dkt. #63], the City's refusal to accept and process the BLA was wrongful and contrary to clearly-established Washington law.

35. From communications between Councilmembers and constituents, it is clear there was a collective intent to stop AMI's Project. For example, Councilmember Mello

received an email from a constituent who had expressed her "fear that [the Moratorium] is not enough to ultimately stop the proposal," that she "hope[d] that the City Council will be able to work with the City planners to ultimately kill this proposal," and that "Tacoma does not need a Walmart." In an email dated September 20, 2011 "Re: Walmart," Councilmember Mello responded: "I could not agree with you more. It is for these reasons that I sponsored the Moratorium."

36. AMI filed an application for a BLA on September 27, 2011. The parcel configuration shown in the BLA corresponded to the parcel configuration presented in the Building Permit Application; the Building Permit Application had clearly disclosed the scope of the project and the need for a BLA. Nonetheless, City Permit Specialist Jason Miller was instructed by City Building Official Charles Solverson to put the BLA application on hold and to send it back to the applicant. The City admits that the BLA satisfied all of the requirements set forth in TMC 13.04.085 and that BLAs are "ministerial" and must be granted if they meet code requirements.

37. The City chose to apply the Moratorium to the AMI project with vested rights prior to the effective date of the Moratorium. At the same time, they were exempting "big box" stores from the plain language of the Moratorium. Instead, the City promptly processed building permit applications for remodels on several properties, but not Walmart.

38. On September 27, 2011, AMI informed the City approval of the BLA was mandatory under applicable law, and if the application was not accepted or processed in the ordinary course of business, Allenmore's damages would be substantial. On September 29, 2011, AMI also requested reconsideration of the City's decisions to refuse the BLA and to place the Building Permit Application on hold.

39. By letter dated October 7, 2011, the City persisted in its decision to apply the Moratorium to the Project. With respect to the Building Permit Application, the City's October 7, 2011 letter gave AMI two options:

> 1. You can submit a revised application that accurately reflects the existing parcel configuration and demonstrates how your proposed development meets code requirements for that existing parcel configuration; or
>
> 2. You can agree to leave the City's review of your application in its current status until the Moratorium either expires or is terminated or modified so as to permit acceptance and processing of a boundary line adjustment consistent with the proposed configuration shown on your existing submittal.

Ex. 125.

40. That action, and the City's October 7 letter (Ex. 125) reaffirming its position, showed that the City was willing to violate established law to delay or derail the project. On August 31, Walmart reasonably believed it had vested rights and the City could not block the project. But the City's actions on September 16 and October 7 showed the City was willing to ignore those vested rights.

41. On October 14, 2011, AMI appealed the City's decision refusing to process the Building Permit Application. On October 21, 2011, AMI appealed the City's decision to refuse to accept and process the BLA.

42. At an October 25, 2011 Council Meeting, Councilmember Lonergan moved to amend Section 5 in Ordinance Number 28027 to add language excepting boundary line adjustments. The motion was tabled. Councilmember Lonergan stated it had been his opinion "from the start of this that we had set ourselves up at the beginning of this Moratorium for the potential for legal action." "The current Moratorium only serves to put the City on extremely precarious ground as it relates to damages for delay to this project. The potential risk to the

City could easily be in the millions of dollars for lost income based on delays."

43. At the City Council meeting held on November 1, 2011, the Council voted to modify the Moratorium so that it no longer applied to boundary line adjustments. This modification was embodied in Substitute Ordinance No. 28027, which took effect on or about November 11, 2011.

44. The actions of the City to apply the Moratorium to the BLA application and to reject the reconsideration request on October 7, 2011, caused Walmart to change its position and to require the delivery of all government entitlements prior to closing. That triggered a series of events damaging to AMI:

    a. On November 4, 2011 AMI was forced to renegotiate the purchase price from the Elks, increasing the purchase price by $500,000 to $12,200,000, and extending the closing date to January 17, 2012. *See* Ex. 342.

    b. On November 7, 2011 AMI was forced to renegotiate the sales price to Walmart, decreasing the price from $11,890,542 to $11,000,000. *See* Ex. 338.

    c. On January 17, 2012, AMI was forced to pay to the Elks the sum of $100,000—not to be applied to the purchase price—to again extend the closing date. *See* Ex. 343.

45. On November 2, 2011, AMI resubmitted its BLA to the City. The City ultimately approved the BLA, and it was recorded on December 27, 2011.

46. Despite the City's acceptance of the BLA, opposition to the Project remained stiff. On November 2, 2011, Councilmember Mello emailed Tricia Deome at the CNC, stating: "We must appeal every single action we can possibly appeal to slow this [the Project]

down and stop it." Indeed, on November 6, 2011, Councilmembers Mello and Fey were out picketing, holding signs saying "Tacoma United Against Walmart."

47. On or about December 28, 2011, the City issued an MDNS Adoption of an Addendum to an Existing Environmental Document (SEP2011-40000172768). This determination prompted further concern on the part of City Councilmembers. In January 2012, Council Member Fey requested a "Walmart" meeting with staff from Legal and from the Building and Land Use Section (BLUS). On January 19, 2012, City Attorney Elizabeth Pauli emailed Community and Economic Department Director Ryan Petty, stating, "The Councilmembers understand the sensitivity of the situation and their role but need to understand the basis for the decision as well as the City's options." A Meeting "re: Walmart" was set for January 24, 2012 with Councilmembers Fey and Mello, Director Petty, Pauli, and BLUS staff.

48. On February 3, 2012, the City told the developer that the building permit was ready to be picked up, but that a "Shopping Center Phased Development Plan" had to be signed prior to issuance. The City had never required a Phased Development Plan for any other shopping center project. When AMI and BCRA refused to sign the Agreement, the City stated that the same items would be imposed as "conditions" to issuance of the building permit.

49. The so-called "Phased Development" conditions effectively required all buildings to be constructed simultaneously in the project, including "outbuldings," and to open simultaneously. Since the buildings intended for the outpads had not yet been designed, and permit applications had not yet been submitted for them, these conditions had the purpose and intent of trying to stop the project or to slow it down.

50. On March 21, 2012, AMI went searching for funds to keep the project alive. One possible lender, SFG, demanded and received a $15,000 non-refundable loan application fee. SFG did not make the loan.

51. In May 2012, Lisa Spadoni, Principal Planner of Development Services, informed Councilman Mello that the Code allows the buildings to be constructed sequentially. *See* Ex. 273.

52. AMI and Walmart objected to the conditions the City sought to impose. The City withdrew the conditions.

53. Ultimately, AMI got a loan from Crosswind Capital at the cost of $397,100 consisting of interest, loan fees, legal fees, and miscellaneous closing costs. These loan costs are directly attributable to the wrongful acts of the City.

54. On March 12, 2012, the City finally issued the building permit that had been applied for on August 31, 2011 to construct a 152,243 square foot building for Walmart on Lot 1, and for site and other improvements on all Lots.

55. AMI was damaged by the City's application of the Moratorium to the Building Permit Application and to the Boundary Line Adjustment application. The City's actions directly and proximately resulted in AMI having to 1) pay more money to the Elks to acquire the Property, 2) to accept less money from Walmart for the purchase of its parcel, and 3) to incur incidental damages in other respects. Had AMI not been willing to make these unfavorable adjustments to its contracts with the Elks and with Walmart, the transactions with those parties would have failed, and AMI's damages would have been much greater. AMI acted reasonably to mitigate its damages under the circumstances.

56. The City repeatedly acted in concert to stop AMI's Project, including but not limited to applying the Moratorium to AMI's Building Permit Application and to its Boundary Line Adjustment Application and to imposing unprecedented concurrent building requirements. This concert of action included the Central Neighborhood Counsel and its management personnel.

57. AMI had valid contractual relationships with Walmart and with the Elks relating to the purchase and sale of the subject Property, and business expectancies relating to the same. The City was informed and knew of AMI's business expectancies.

58. The City intentionally interfered with AMI's business expectancies for an improper purpose: to prevent or delay the development of AMI's vested shopping center project.

59. The City intentionally interfered with AMI's business expectancies through improper means, including wrongful application of the Moratorium to the Project, placing the Building Permit Application on hold, delaying amending the Moratorium to except BLAs so that it would not occur until after AMI's right to purchase the property expired, adopting and approving executive "BLUS Bulletins" that purported to rewrite the Moratorium to permit the acceptance and processing of permit applications on projects that (unlike AMI's) were actually covered by the Moratorium, and using a concurrent building requirement to stop the permitting and construction of the Walmart building until the outpad buildings were constructed.

60. The City's interference with AMI's business expectancies caused AMI to incur substantial damages in the form of a higher purchase price paid to the Elks, a lower purchase price paid by Walmart, and incidental damages.

61. The application of the Moratorium to AMI's Building Permit and Boundary Line Adjustment were aimed at keeping Walmart out of the Tacoma community.

Based on the foregoing Findings of Fact, the Court hereby adopts the following Conclusions of Law.

## II. CONCLUSIONS OF LAW

1. The Emergency Moratorium was a lawful enactment under the City Charter. The Councilmembers are legislatively immune for their decision regarding the Moratorium. They are not liable for that, or any other, individual conduct.

2. The development rights vested when the building permit was filed prior to the Moratorium's effective date. The vested rights doctrine entitles developers to have land development proposals processed under the regulations in effect at the time a completed building permit application is filed, regardless of changes in zoning or other land use regulations.

3. The City's decision to apply the Moratorium to the BLA application was wrong as a matter of law.

4. The City is liable under 42 U.S.C. § 1983 for depriving AMI of its substantive due process rights and of equal protection under the law.

   a. AMI had a constitutionally protected property interest in the Building Permit Application and in the Boundary Line Adjustment application.

   b. The City violated AMI's substantive due process rights by engaging in legally irrational actions unrelated to any legitimate governmental purpose. The City's actions shock the conscience of the Court. These actions were done under color of state law.

    c. The City deprived AMI of the equal protection of the laws by, among other things, intentionally treating AMI differently from other similarly situated citizens without any rational basis for the difference in treatment. These actions were done under color of state law.

  5. The City tortiously interfered with AMI's business expectancies for an improper purpose and/or using improper means.

  6. The City is liable to AMI for compensatory damages in the amount of $2,026,391.00:

| | |
|---|---|
| Increase of Purchase Price of Elks Property - | $500,000 |
| Non-Applicable Extension Payments to Elks - | $205,000 |
| Decrease in Sales Price to Walmart - | $890,542 |
| Loan Expenses - | $397,375 |
| Attorney's Fees - | $33,474 |
| Total: | $2,026,391.00 |

  7. The City is also liable for AMI's reasonable attorney's fees and costs of this litigation, in an amount to be determined by the Court in a subsequent order.

IT IS SO ORDERED.

Dated this 14th day of April, 2017.

                  *Ronald B. Leighton*
                  Ronald B. Leighton
                  United States District Judge

FINDINGS OF FACT AND CONCLUSIONS OF LAW
(Cause No. 3:14-cv-05717) – Page 17